**In the Matter of UNITED STATES EXPRESS, a California corporation, Bankrupt.**

**No. 71852.**

United States District Court
N. D. California, S. D.
July 7, 1966.

Rankin, Oneal, Luckhardt, Center, Longinotti & Ingram, San Jose, Cal., by J. E. Longinotti, San Jose, Cal., for petitioner Garden City Transportation Co., Ltd.

Dinkelspiel & Dinkelspiel, San Francisco, Cal., by Harold A. Block, San Francisco, Cal., for John O. England, Trustee in Bankruptcy.

## MEMORANDUM OPINION AND ORDER

GEORGE B. HARRIS, Chief Judge.

This matter is here on petition for review of a decision of the Referee in Bankruptcy. The question is whether or not petitioner is entitled to the status of a secured creditor in the bankruptcy proceedings. This court holds that he is so entitled and therefore reverses the decision of the Referee.

Petitioner, Garden City Transportation Co., Ltd. and the bankrupt, United States Express, Inc., are both highway common carriers regulated by the California Public Utilities Commission. In February 1958, they entered into an agreement whereby Garden City agreed to sell, and United States Express agreed to buy, a certificate of public convenience and necessity covering operative rights between certain points in California. The agreement provided in part as follows:

\* \* \* \* \* \*

WHEREAS, Seller holds certificates of public convenience and necessity \* \* \* from the Public Utilities Commission of the State of California, for the transportation of general commodities \* \* \* and is willing to dispose of such operating authority, together with the business and good will pertaining thereto; and

WHEREAS, Buyer is desirous of acquiring such operating authority, business and good will;

NOW, THEREFORE, in consideration of the promises and of covenants hereinafter contained, it is mutually agreed as follows:

\* \* \* \* \* \*

2. Seller agrees to sell and Buyer agrees to buy the aforementioned certificates, together with the business and good will pertinent thereto. Buyer agrees to pay to Seller for such certificates, business and good will, the sum of Forty-Five Thousand Dollars ($45,000.00), payable as follows:

a. Twenty-five Hundred Dollars ($2,500.00) upon the closing date.

The term "closing date" means the date upon which this transaction shall be consummated, and shall be the tenth day after the effective date of an order approving this transaction by the Commission. \* \*

b. Twenty-Five Hundred Dollars ($2,500.00) [on] November 1st, 1958.

c. Five Hundred Dollars ($500.00) per month, commencing after the closing date, for twenty-four (24) successive months.

d. The then remaining balance at the expiration of such twenty-four (24) month period.

Unpaid balances shall bear interest at the rate of six percent (6%) per annum, and such accrued interest shall be paid at the time of the principal payments specified herein.

*If purchaser shall default on any above terms and conditions, seller may then declare all payments made as damages and have the right to retake said franchise in lieu of any obligations still owing.*

3. *It is understood and agreed that this Agreement is conditioned on and subject to approval of the Commission . . . In the event the Commission shall refuse to authorize:*

(a) *The consummation of the transaction proposed herein,*

\* \* \* \* \* \*

*then this agreement shall cease and terminate and all obligations of either party to the other shall cease and terminate.* \* \* \* (Emphasis added.)

This agreement was then made part of an application for approval and submitted to the Public Utilities Commission. In December 1958, the Commission gave its approval and United States Express took over the certificate and began making payments.

On December 1, 1962, United States Express succumbed to financial difficulties and executed an assignment for the benefit of creditors. At that time the contract was in default, with $12,673.38, plus accrued interest, still owing.

On December 13, 1962, Garden City, after learning of the assignment, notified United States Express of its intention to exercise its right under the 1958 agreement to retake the certificate. The assignee for the benefit of creditors, however, refused to return the certificate and instead contracted to sell it for $85,000 to Garrett Freightlines, Inc. Thereafter United States Express filed its voluntary petition of bankruptcy and on March 29, 1963, was duly adjudged a bankrupt. The trustee in bankruptcy adopted the contract to sell the certificate to Garrett and instituted proceedings for approval before the Public Utilities Commission. Garden City, still asserting its right to the certificate, intervened in these proceedings in opposition to the proposed sale. Then, after some negotiation, the trustee in bankruptcy and Garden City entered into a stipulation by the terms of which Garden City agreed to withdraw its opposition to the sale, without prejudice, and assert instead a claim of lien upon the proceeds of the sale. Garden City then withdrew its opposition, joined in urging Commission approval of the sale, and the sale was approved. The trustee then applied to the Referee in Bankruptcy for an order approving the sale and determining the validity of Garden City's claim of lien. The Referee immediately approved the sale and set the question of the validity of the claim of lien for hearing. After the hearing had been held the Referee handed down his decision denying the claim of lien and entered a finding that Garden City was a generally unsecured creditor with a claim of $12,673.38, plus accrued interest of $1,074.94. This petition for review followed.

Petitioner's position can be summarized as follows. The contract formulated by petitioner and the bankrupt is a conditional sale contract the legal effect of which is to reserve title, for security purposes only, in the seller. This contract, in its entirety, was duly put before the Public Utilities Commission and the Commission approved it. Now, with the contract in default and the purchaser in bankruptcy, petitioner is entitled to the security for which he bargained.

The first contention, that this is a conditional sales contract, seems amply supported by the decisions of the California courts and is not seriously disputed by the trustee. The characteristic feature of a conditional sale—reservation of title in the seller—is not explicitly stated in the contract, but the cases hold it need not be. See Katz v. People's Finance & Thrift Co., 101 Cal.App. 552, 281 P. 1097 (Dist.Ct.App.1929); Beaudry v. Peterson, 50 Cal.App.2d 478, 123 P.2d 108, 124 P.2d 637 (Dist.Ct.App. 1942). The intention to reserve title in the seller, for security purposes only, may be gathered from the contract as a whole. Rodgers v. Bachman, 109 Cal. 552, 42 P. 448 (1895); Van Allen v. Francis, 123 Cal. 474, 56 P. 339 (1889); Perkins v. Mettler, 126 Cal. 100, 58 P. 384 (1899).

By the inclusion of the clause giving Garden City the right to retake the certificate upon the buyer's default, the parties clearly indicated an intent to give the seller some kind of security interest. The nature of the seller's remedy —the right to retake the certificate and retain all payments made as damages— negatives the possibility that they meant to create a chattel mortgage.[1] Cf. Van Allen v. Francis, supra, 123 Cal. at 479, 56 P. 339. Garden City, after retaking the certificate, is left free to exercise complete dominion and control over it. This is the remedy of a seller who has never completely parted with title, i. e., a conditional vendor. Accord, Katz v. People's Finance & Thrift Co., supra, 101

---

1. Petitioner concedes that if the contract in fact created a chattel mortgage, then, because it was not recorded, it is invalid as against the trustee under the "strong-arm" clause [§ 70(c)] of the Bankruptcy Act. 11 U.S.C. § 110(c). A conditional sale contract, on the other hand, need not be recorded in California to be effective against creditors. See 43 Cal.Jur.2d Sales § 320 (2d ed. 1958); 4 Collier, Bankruptcy Par. 70.19 [9], pp. 1131–1132 & n. 39 (14th ed. 1964).

C.A.2d at 560, 281 P. 1097. See also Johnson v. Kaeser, 196 Cal. 686, 694, 239 P. 324 (1925); 5 Williston, Contracts § 735, p. 476 (3d ed. 1961); 43 Cal.Jur.2d, Sales § 353 (2d ed. 1958). By contrast, a chattel mortgagee has no right to repossess the property and retain it. His remedy is to subject the property to a sale, applying the proceeds in satisfaction of his debt, and returning any surplus to the chattel mortgagor. Until his title is cut off by a foreclosure or other proper sale the chattel mortgagor retains title. See 10 Cal.Jur.2d, Chattel Mortgages §§ 76–98 (2d ed. 1953).

◼ The contract also states: "Seller *agrees to sell* and Buyer *agrees to buy* the aforementioned certificates. * * " (Emphasis added.) This too suggests a conditional sale. The courts have often stressed the phrases "agrees to sell" and "agrees to buy" when interpreting a contract as a conditional sale contract. See, e. g., Van Allen v. Francis, supra; Perkins v. Mettler, supra; Katz v. People's Finance & Thrift Co., supra. The courts take these phrases to mean that the sale in question is executory, i. e., the sale will not be completed until the full purchase price is paid. Until the full price is paid, title, for the security purposes only, remains in the seller. The Referee, in his opinion, did not dispute that these phrases suggest an executory sale. He argued, however, that the sale was meant to be executory in the sense that it could not be completed until approved by the Public Utilities Commission. But even if this interpretation is correct it would not follow that the contract is not also executory because contingent upon full payment of the purchase price.

In short, the contract in question indictates that the parties intended to give the seller a security interest. Though the parties did not state explicitly what kind of security interest they had in mind it appears that they intended to create a conditional sale contract. And, as the trustee pointed out in his brief before the Referee (at p. 3), there is little or no basis for reading the contract as creating a chattel mortgage. The conclu-sion must therefore be accepted that this is a conditional sale contract.

◼ What is the legal effect of the Commission's opinion and order approving the sale? The question is complicated by the fact that the Commission's opinion and order makes no explicit mention of the security features of the contract. The Commission's opinion first sets out the details of the operative rights covered by the certificate. Then, after a brief discussion of the purchase price, the terms for its payment, and the buyer's financial condition, the Commission concludes:

> *Under the circumstances as disclosed in this proceeding, it would appear that the purchaser has sufficient resources to continue the business and to meet the obligations it will acquire and we are of the opinion, therefore, and so find, that the transfer will not be adverse to the public interest.* (Emphasis added.)

The opinion then ends with a discussion of several matters not relevant here. Immediately following the opinion is the Commission's order, which provides, in pertinent part, as follows:

> The Commission having considered the above-entitled matter and being of the opinion that a public hearing is not necessary, that the application should be granted, and herein provided. * *
>
> IT IS HEREBY ORDERED as follows:
>
> 1. Garden City Transportation Co., Ltd., may sell to [United States Express Co.] the operative rights acquired by it pursuant to authorization granted by Decision No. 534474, dated July 23, 1956, such transfer, if accomplished, to be completed on or before June 30, 1959. * * *
>
> * * * * * *
>
> 3. [United States Express Co.], in acquiring said operative rights, may incur long-term indebtedness in an amount of not to exceed $45,000 as set forth in this application. * * *

The effect of this opinion and order appears to be that the transaction, as

proposed, was approved by the Commission. The above-quoted paragraph from the opinion refers to "the circumstances *as disclosed* in this proceeding." (Emphasis added.) The provision giving the seller a security interest in the certificate was certainly "disclosed" in the proceeding. The contract, as submitted to the Commission, is a simple, three-page, typewritten document in which the clause giving Garden City the right to retake the certificate upon the buyer's default is clearly set out. Indeed, this clause is perhaps the most conspicuous feature in the contract for it appears to have been inserted subsequent to the time when the contract was originally prepared. The clause is awkwardly typed[2] in between the end of paragraph 2 and the beginning of paragraph 3, and the parties' initials appear in the left-hand margin immediately above the inserted clause. Not only was this clause clearly disclosed in the proceeding, thus undermining any inference that the Commission simply overlooked the contract's security provisions, but paragraph 3 of the Commission's order authorizes the buyer to "incur long-term indebtedness in an amount of not to exceed $45,000 *as set forth in this application.*" (Emphasis added.) Referring back to the contract, the purchase price and the terms upon which it is to be paid are "set forth" in paragraph 2, and one of those terms is that the buyer's default shall give the seller the right to retake the certificate. The clear implication would appear to be that the Commission approved this latter term along with the others set forth in paragraph 2, and in so doing the Commission approved Garden City's retention, for security purposes, of title to the certificate.

The trustee, in his briefs, and the Referee, in his opinion, seek to avoid this result by arguing that it leads to the conclusion that the Public Utilities Commission has made inconsistent decisions. They point to the Commission's decision

in A.T.L., Inc., 56 Cal. P.U.C. 269 (1958), where the Commission disapproved of a proposed conditional sale of a certificate of public convenience and necessity. In reference to the contract provision giving the seller the right to retake the certificate upon the buyer's default the Commission said:

> One effect of said provision is to provide for the possible reverter of public utility operating rights without approval by this Commission. The Commission finds that this is contrary to public policy and the express language of Section 851 of the Public Utilities Code. * * * 56 Cal. P.U.C. at 271.

The Commission went on to say:

> Another reason why this application must be denied is that the form of the agreement is contrary to the public interest. It has heretofore been indicated that the contract between A.T.L. and American is one of conditional sale. As a general rule, a conditional sales contract whereby a seller retains legal title to a public utility's operating property and attempts to divest himself of public responsibility is not in the public interest. (Citations omitted.) Id. at 272.

The trustee and the Referee conclude from this that the Commission's failure in the instant case to refer to the fact that the proposed contract was a conditional sale contract must be interpreted to mean that the Commission did not approve a conditional sale. But this conclusion does not necessarily follow. The inconsistency between the Commission's apparent approval of a conditional sale in this case and its decision in *A.T.L.* is not as great as it might at first seem. The disapproval in *A.T.L.* of a conditional sale was coupled with a finding that the buyer had insufficient financial resources to meet its obligations under the contract. And "[i]t is against policy to approve a transfer when the value of the property or the payments agreed upon require applicant to assume an al-

---

**2.** In this respect the copy of the contract attached to the record herein differs from the copy actually submitted to the Com- mission. On the former the clause is written in by hand; on the latter it is typed in.

most insurmountable burden." (Citations omitted.) 56 Cal. P.U.C. at 272. By contrast, in this case the Commission expressly found that the buyer had sufficient resources to meet the obligations it proposed to incur. Indeed this seems to have been the crucial element in the Commission's decision to approve the transaction. In the previously-quoted passage from the Commission's opinion in this case the Commission said, "* * * the purchaser has sufficient resources to continue the business and to meet the obligations it will acquire and * * * *therefore* * * * the transfer will not be adverse to the public interest." (Emphasis added.) Notwithstanding the broad language of *A.T.L.* the Commission's basic concern is apparently less with the precise form of the seller's security interest than with the buyer's financial ability to meet the obligations its proposes to incur. This would be consistent with the statement in *A.T.L.* that it is the "general rule" that conditional sales of public utility property are not in the public interest.

Further, *A.T.L.* was a different case, involving different facts and different parties. By itself it has no direct effect here. At most it is a precedent upon which the Commission might have relied had it wished to disapprove this agreement. But *A.T.L.* was not cited here and nothing in the Commission's opinion and order indicates that it was relying on or following *A.T.L.* And it may be pointed out that there is no reason to think that the Commission was unaware that the Contract proposed by Garden City and United States Express was a conditional sale contract. Not only is that the clear import of its terms, but in *A.T.L.*, when confronted by a provision substantially similar to the clause giving Garden City the right to retake the certificate upon the buyer's default, the Commission had no difficulty interpreting the contract as a conditional sale contract. Therefore, if the view taken by the trustee and the Referee is correct it follows that what the Commission did here was to omit from the approval of the agreement the all-important provisions giving Garden City a security interest, thus converting the transaction from a conditional sale to an absolute sale. Put another way, the Commission approved a different agreement than that proposed by the parties. Not only is it unlikely that the Commission would do this without comment of any kind, and without holding a hearing, but this interpretation of the Commission's action merely resolves one ambiguity by substituting another for it. If the Commission approved an agreement other than that proposed by the parties, then what became of paragraph 3 of the contract? Paragraph 3 provides that if the Commission fails to approve "*the transaction proposed herein* * * * then this agreement shall cease and terminate and all obligations of either party to the other shall cease and terminate." (Emphasis added.) This language is self-executing, leaving nothing to be done by either party. Thus, the consequence of the argument advanced by the trustee and adopted by the Referee is that upon the entry of the Commission's opinion and order herein the agreement between Garden City and United States Express terminated. It is abundantly clear that neither the Commission nor the parties thought that had happened. Under all the circumstances, then, there is no sufficient basis to justify this court in undertaking the Procrustean task of forcing *A.T.L.* and the case at bar into a common mold, thereby defeating the apparent intent of the parties and cutting off Garden City's bargained-for security interest.

The court therefore holds that the contract between petitioner and the bankrupt was a conditional sales contract; that the contract, as proposed, was approved both expressly and impliedly by the Public Utilities Commission; and that, the contract being in default, Garden City is now entitled to its security.

■ One final matter deserves brief mention. The Referee, in his Certificate on Petition for Review, charges petitioner with bad faith for having raised

a new issue on petition for review. This issue, according to the Referee, is whether the stipulation, by which Garden City and the trustee agreed that Garden City would withdraw its opposition to the sale of the certificate to Garrett and assert instead a claim of lien upon the proceeds of the sale, does not *by itself* have the effect of giving Garden City a lien. Garden City vigorously objects that this charge is based upon a misreading of the petition for review. The language in question is as follows: "The provision of the agreement set forth in Finding 3, together with the stipulations entered into between the bankrupt and Garden City Transportation Co., Ltd. under the law had the effect of giving to petitioner a lien on the proceeds of the sale." Garden City contends this is not an argument that the stipulation, standing alone, established a lien. This contention is well taken.

The Referee's Order of November 24, 1965, is hereby reversed.